# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-20-00531-CV

---

### M. D., Jr. and C. A., Appellants

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE 274TH DISTRICT COURT OF HAYS COUNTY
### NO. 18-0752, THE HONORABLE DAVID JUNKIN, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Following a bench trial, the trial court signed a final order terminating the parental rights of C.A. (Mother) and M.D., Jr. (Father) to their daughter, A.A.[1]  Mother and Father have each filed a notice of appeal asserting that the evidence is insufficient to support the trial court's findings that statutory grounds for termination exist, *see* Tex. Fam. Code § 161.001(b)(1)(E), (N), (O), and that termination of their parental rights is in their child's best interest, *see id.* § 161.001(b)(2).  Mother and Father also contend that the trial court abused its discretion in appointing the Department of Family and Protective Services (the Department) as A.A.'s sole permanent managing conservator.

Because we conclude that the evidence is insufficient to support the trial court's findings as to statutory grounds for termination, we will reverse that portion of the trial court's

---

[1] We will refer to the child and other family members involved in this case using pseudonyms or by their initials.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8(b)(2).

order terminating the parental rights of Mother and Father. We will affirm, however, that portion of the trial court's order appointing the Department as A.A.'s managing conservator.

**BACKGROUND**

On December 14, 2017, Mother gave birth to A.A. at Seton Hospital in Austin. Because she was born eleven weeks premature, A.A. was immediately placed in the hospital's neonatal intensive care unit (NICU). On March 14, 2018, the Department received a referral from the hospital alleging that Mother and Father had failed to "engage with medical staff" for the purpose of learning how to properly care for A.A. and that hospital staff were concerned about discharging the child to her parents' care.

On March 29, 2018, the Department filed an original petition in a suit affecting the parent-child relationship, seeking temporary managing conservatorship of A.A. and to terminate Mother's and Father's parental rights to A.A. in the event reunification could not be achieved. That same day, the Department sought and obtained emergency managing conservatorship over A.A. and placed her with a foster family. Following an adversary hearing, the trial court appointed Mother and Father temporary possessory conservators with visitation supervised by the Department. The trial court also ordered the Department to conduct a home study on the parents and directed the parents to comply with the Department's family-service plans during the pendency of the suit.

Beginning on September 11, 2019, the case to terminate Mother's and Father's parental rights proceeded to a bench trial before an associate judge. *See* Tex. Fam. Code § 201.201 (powers of associate judge in child-protection cases). During the proceedings, which lasted six days, the associate judge heard the following:

2

- Mother has a reported history of having sustained multiple head injuries. For several years, Mother has suffered from seizures and has been unable to drive. Mother has also been diagnosed with migraines, blood clots, and post-traumatic stress disorder (PTSD), and in the past, she has suffered from depression and related anxiety. According to Mother's primary care physician, she takes a variety of medications to treat her conditions, including several prescriptions containing amphetamines.

- Mother and Father started dating in 2017, and the couple lives next door to Father's parents. Father owns a waste disposal company and works approximately 12 hours a day. Mother is not employed but sometimes helps Father with his business.

- On October 21, 2017, Mother, who was four-months pregnant with A.A., was involved in a car accident as a passenger. She was admitted to Seton Hospital in Kyle, then to Seton Hospital in Austin, and eventually to a rehabilitation center for physical and occupational therapy. Following a month-long stay in the rehabilitation center, and after her seizures worsened and her overall health continued to decline, Mother was hospitalized again at Seton Hospital in Austin in early December.

- Soon after her birth, A.A. was diagnosed with Down Syndrome, and due to difficulties with feeding, a nasogastric tube ("NG tube") was used to supplement her feedings in the NICU. Due to complications from delivery, Mother was initially placed in the intensive-care unit and due to an infection, underwent an additional surgery and received two blood transfusions.

- Hospital social worker, Beth Bishop, first met with Mother in the hospital on December 15, 2017. Bishop made a referral for the family to Down Syndrome of Central Texas and arranged for Mother to stay in the Ronald McDonald house in January 2018 so that

3

Mother, who lived 25 miles away, could see A.A. more often. Bishop testified that on one occasion, she received a phone call from the Ronald McDonald House stating that staff there had "not seen [Mother] much this week" and "want[ed] to check on her plans." Bishop reported at trial that during the month of January, Mother or Father visited A.A. in the NICU on thirteen days; on fifteen other days, Mother or Father called the NICU unit to check on A.A. The parents disputed the accuracy of the visitation numbers reported by Bishop.

- During the month of February 2018, neither Mother nor Father visited A.A. in the NICU. According to Mother and Father, they were unable to visit in February because they were both sick—first, Mother with pneumonia, and then Father with influenza. Pursuant to hospital policy, Mother and Father were told by hospital staff that they could not come to the NICU until everyone in the household was well. On fifteen days in February, Mother or Father called the NICU to check on A.A. and to update staff on their ongoing illnesses.

- In March 2018, the hospital began to prepare for A.A.'s discharge. On March 8, Bishop spoke with Father about the parents' plans for A.A. once she went home with the family. Specifically, Bishop told Father that, given Mother's seizure history and Father's work schedule, someone would need to stay with Mother and A.A. at all times when Father was unable to do so. Bishop also explained that before A.A. could be discharged, this designated family member, along with Mother and Father, would need to be trained on how to care for A.A., in particular, on how to feed A.A. using the NG tube.

- On March 14, during a "care meeting" with Mother at the hospital, the NICU doctor emphasized to Mother that she and A.A.'s other caretakers needed to commit to "coming this weekend to learn how to feed, insert, and clean the tube" and that they should expect

4

to stay for three to six hours each visit. Mother responded that she would call the NICU by March 16, 2021, with dates and times that she and other family members would come to the NICU for training.

- Bishop testified that, in her opinion, Mother and Father needed to meet with A.A. five days per week to establish "feeding success" but that, according to her records, during the month of March, the parents visited A.A. on only nine days and called the NICU on twelve days. In addition, there were seven days in March with no calls and no visits. Bishop testified that Mother and Father also missed or were late to several scheduled feedings at the hospital in March. While the parents' designated family member (A.A.'s paternal grandfather) successfully demonstrated three NG tube placements by March 23, Father and Mother attempted but were unable to do so.

- According to Bishop's notes, there was "much concern that mother of the baby [was] still not coming [to the NICU] consistently," and the "[d]octor [was] concerned that baby [was] not doing well" and did not "have confidence that mother of the baby [was] going to change her behavior." Bishop testified that her initial concerns for Mother's mental health and family support were somewhat alleviated due to paternal grandfather's involvement, but "the primary concern of consistent care for the baby [had] still not been ameliorated due to inconsistent involvement from parents" and because it was not clear if the grandparents were "willing, able to take [A.A.] home."

- In his testimony, Father disputed Bishop's account of how often he visited A.A. at the NICU, but acknowledged he missed "quite a bit." Father also recalled that both he and his father demonstrated three successful NG placements. In her testimony, Mother described the training she received on caring for A.A. on feeding A.A., and on placing

5

the NG tube. According to Mother, she successfully placed the NG tube at least two times. By the time of trial, A.A. was no longer using the NG tube, and Mother was feeding A.A. during supervised visits with A.A.

As to events occurring after A.A.'s removal on March 29, 2018, the associate judge heard, in part, evidence of the following:

- As required by her family-service plan, Mother underwent a psychological evaluation in January 2017 and again in August 2018, and both psychologists testified at trial. According to their testimony, Mother reported to both psychologists that approximately ten years ago, she had been abducted and held captive in the United Kingdom for a year by a former boyfriend, that he attempted to kill her, and that, in doing so, he caused her to suffer a head injury and PTSD. In addition, both psychologists testified that testing had indicated that Mother's intellectual function is below average. The psychologist who conducted the January 2017 evaluation explained that Mother's "abstraction scores" are particularly low and that this would make it difficult for Mother to complete complex tasks and learn new information. In addition, both psychologists testified that Mother engaged in "positive impression management during the evaluation" and that her motivation for treatment was below average. Finally, both psychologists diagnosed Mother with PTSD and major depressive disorder, in remission, and recommended that she receive parenting education, consultation with a doctor regarding her medications, individual therapy, and an evaluation by a neurologist.

- In addition, the psychologist who conducted Mother's August 2018 evaluation explained at trial that testing of Mother's psychopathology revealed concerns about her physical

6

functioning and whether her health problems were, in fact, a result of psychological problems. The psychologist suggested that while Mother's reports of "peculiar experiences," including her reported abduction, indicate that she might be experiencing delusions, additional "outside data" would be needed to confirm this.

- A psychological evaluation was performed on Father in August 2018. According to the psychologist's testimony at trial, testing revealed that Father's IQ is 63 and that this is "in the impaired range of functioning," meaning that Father's reasoning and executive functioning is impaired. Assessment of Father's psychopathology revealed only that Father had low to average distress, and based on this distress, the psychologist diagnosed Father with "adjustment disorder unspecified." The psychologist explained at trial that this means that there is a current stressor "that's going on in his life that is causing problems"—likely the Department's case to terminate his parental rights—but no specific depression, anxiety, or behavioral issues. Father has no history of drug use or other criminal activity. The psychologist recommended parent coaching and parent services for Father.

- In February 2019, Mother gave birth to another child, N.A. Like A.A., N.A. was born premature and, consequently, spent approximately a month in the NICU, first at Dell Children's and then at Seton Hospital in Hays County. According to the social worker at Seton Hays, Amy Mitchell, hospital staff was concerned that Mother was visiting N.A. in the hospital "sporadically." However, on cross-examination, Mitchell acknowledged that the notes from staff in the NICU at Seton Hays indicated Mother was at the hospital most days and that it was unclear from the notes how often Father, grandparents, or other family members visited. In addition, although N.A. did not require an NG tube, Mother

7

had to be instructed several times on how to hold N.A. when she was feeding her so that the child did not get "apneic," which Mitchell described as "choked up." Hospital staff reported that Mother became "tearful and frustrated" by this instruction. Upon hospital staff's request, Mother roomed with N.A. for two days to demonstrate to staff that she could properly position and feed N.A. without incident. Upon successful completion of Mother's stay at the hospital, N.A. was discharged from the hospital and placed in the care of Father's parents, next door to Mother and Father. Nothing in the record suggests that N.A. has been neglected or is otherwise not doing well in her grandparent's care. Father testified that N.A. is doing well and is current on all her medical visits.

At the conclusion of the proceedings, the associate judge signed an order recommending termination of Mother's and Father's parental rights. After Mother and Father affirmatively waived their right to a de novo hearing, the termination order became the judgment of the referring trial court, and this appeal followed.[2] *See* Tex. Fam. Code § 201.2041(a).

In their appellant's briefs, Father and Mother each raise four issues challenging the legal and factual sufficiency of evidence supporting the trial court's decision to terminate their parental rights. In a fifth issue, Mother and Father each contend that the trial court erred

---

[2] Mother and Father initially timely filed a request for de novo hearing and then, before a de novo hearing was held, filed a notice of appeal in this Court. Because "nothing in the record indicate[d] that the right to a de novo hearing had been affirmatively waived" and, therefore, because there was no final judgment in the matter, we dismissed the appeal for want of jurisdiction. *See C.A. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00158-CV, 2020 Tex. App. LEXIS 6615, at *2-3 (Tex. App.—Austin Aug. 18, 2020, no pet.) (mem. op.). After affirmatively waiving their right to a de novo appeal, Mother and Father then filed the notices of appeal that are the basis of this appeal. In this opinion, we will also refer to the associate judge as the "trial court."

in "ignoring the parental presumption" when it appointed the Department as A.A.'s managing conservator.[3]

## STANDARD OF REVIEW

"While parental rights are of constitutional magnitude, they are not absolute." *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). To terminate a parent-child relationship, the Department must prove by clear and convincing evidence that (1) the parent's acts or omissions constitute at least one of the enumerated statutory grounds for termination and (2) it is in the child's best interest to terminate the parent's rights. Tex. Fam. Code § 161.001(b)(1), (2). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007. "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

In reviewing the sufficiency of the evidence in parental-termination cases, we apply a standard of review on appeal that reflects this heightened standard of proof, *see In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002), focusing on whether the evidence is such that a reasonable factfinder could form a firm belief or conviction that the challenged finding was true,

---

[3]  In what she identifies as a sixth issue, Mother states that the trial court erred in admitting certain evidence at trial and, in a seventh issue, that her trial attorneys provided ineffective assistance of counsel. In the body of her brief, however, Mother provides no substantive analysis or arguments on these issues and, instead, "requests leave to file a supplemental brief to address" these issues. In her subsequently filed supplemental brief, these issues are not discussed. Consequently, we conclude that they have been inadequately briefed and therefore are waived. *See* Tex. R. App. P. 38.1(f), (i) (appellant's brief must "state concisely all issues or points preserved for review" and "contain a clear and concise argument for the contentions made, with appropriate citation to authorities and to the record"); *see also Valadez v. Avitia*, 238 S.W.3d 843, 845 (Tex. App.—El Paso 2007, no pet.) ("An appellate court has no duty—or even right—to perform an independent review of the record and applicable law to determine whether there was error.").

*In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We defer to the decisions of the factfinder, which, "having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

"The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to the finding may be considered." *In re A.C.*, 560 S.W.3d at 630. In evaluating the legal sufficiency of the evidence, the reviewing court "cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding." *Id.* at 630-31; *In re J.F.C.*, 96 S.W.3d at 266. "A corollary to this requirement is that a court should disregard evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.F.C.*, 96 S.W.3d at 266. Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the finding and considering undisputed contrary evidence, a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re A.C.*, 560 S.W.3d at 631; *In re J.F.C.*, 96 S.W.3d at 266.

A factual-sufficiency review, in contrast, requires "weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *In re A.C.*, 560 S.W.3d at 631. "In a factual-sufficiency review, the appellate court must consider whether the disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

10

## DISCUSSION

**Statutory Findings**

In this case, the trial court affirmatively found that the Department met its burden as to the three statutory grounds alleged by the Department—subsections (E), (N), and (O) of Section 161.001(b)(1)—and that termination of Mother's and Father's parental rights was in A.A.'s best interest. On appeal, Father and Mother challenge the legal and factual sufficiency of the evidence supporting the trial court's findings as to each statutory ground, along with the trial court's best-interest finding. We will begin our review by determining whether the evidence is legally and factually sufficient to support the trial court's finding of endangerment under subsection (E). *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam) (holding that due process requires appellate courts to review challenged subsection (D) and subsection (E) findings, even when trial court made another finding upon which the termination could be upheld).

### *Subsection (E), Endangerment*

The trial court may order termination of the parent-child relationship under subsection (E) if clear and convincing evidence establishes that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). In this context, endangerment means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Instead, a child is "endangered" if the child is exposed to loss or injury or if her emotional or physical health is jeopardized. *A.S. v. Texas Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 711 (Tex. App.—El Paso 2012, no pet.). "As a general rule,

11

conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re J.O.A.*, 283 S.W.3d 336, 336 (Tex. 2009).

When evaluating the evidence with respect to subsection (E), the focus is on the parent's conduct—including acts, omissions, or failures to act—and, more specifically, whether evidence exists that the child's physical or emotional well-being was endangered as a direct result of the parent's conduct. *A.S.*, 394 S.W.3d at 711. Termination under subsection (E) requires more than a single act or omission; instead, the evidence must demonstrate a "voluntary, deliberate, and conscious course of conduct" by the parent. *In re M.L.L.*, 573 S.W.3d 353, 365 (Tex. App.—El Paso 2019, no pet.); *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied). Subsection (E) does not require, however, that the conduct be directed at the child or that the child actually suffer injury. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.— Houston [14th Dist.] 2014, pet. denied). Further, to determine whether a parent engaged in an endangering course of conduct, the factfinder may consider conduct that occurred both before and after the child was born, including conduct that occurred after the child was removed from her parent's custody. *In re J.O.A.*, 283 S.W.3d at 345; *In re S.R.*, 452 S.W.3d at 360.

In this case, A.A. was removed from her parents' custody while she was still in the care of the NICU. There is no allegation or evidence suggesting that any act or omission by the parents caused A.A. to be born premature or that A.A. suffered any physical harm while she was in the NICU. Instead, at trial and now on appeal, the Department argues that Mother and Father both engaged in "endangering conduct" by (1) failing to visit the NICU with enough regularity to properly bond with A.A.; (2) failing to complete the hospital's requirements for learning how to insert and maintain the NG tube; and (3) failing to attend a majority of A.A.'s medical appointments during the pendency of this case. Consequently, a large portion of the

12

evidence presented at trial concerned the frequency of the parents' visitation at the NICU, including undisputed evidence that the parents failed to visit the NICU during the entire month of February 2018, as well as the reasons offered by the parents for their failure to visit more frequently. The Department also presented evidence, although disputed by Mother and Father, that they both failed to complete three successful placements of the NG tube, as required by the NICU staff. Finally, social worker Bishop testified that while A.A. was in the NICU, she was concerned and remained concerned about whether the parents could adequately bond with A.A. and whether they could provide "consistent care for the baby" due to what she considered to be their "inconsistent involvement."

While we agree that the trial court, as the trier of fact, could have reasonably inferred from the evidence before it that Mother and Father failed, without a sufficiently valid reason, to regularly visit the neonatal unit and that they failed to learn how to insert and maintain the NG tube, we disagree that this conduct, standing alone, supports termination under subsection (E).[4] For example, to the extent Bishop suggested that the parents irregular visitation was generally inadequate for proper bonding and to learn to care for A.A., the record does not include any evidence as to what minimum visitation schedule would have been necessary for Mother and Father to "properly bond" with A.A. or how a failure to "properly bond" in the NICU was endangering to A.A. *See C.L.J. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-13-00646-CV, 2014 Tex. App. LEXIS 3146, at *13-14 (Tex. App.—Austin Mar. 20, 2014, pet. denied) (mem. op.) (concluding that evidence of parents' rate of visitation to NICU was legally

---

[4] We recognize that "endangerment" does not need to be established as an independent proposition but may, instead, be inferred from the parental misconduct alone. *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). On this record, however, we cannot conclude that a reasonable factfinder could infer endangerment based solely on the parents' failure to visit the NICU and to demonstrate proficiency with the NG tube.

13

insufficient to support termination based on endangerment and noting that there was no evidence "of some objective, reliable standard related to NICU visitation that could lead a reasonable person to believe [parents'] rate of visitation" endangered their child). Finally, while we recognize the NICU staff's concerns with discharging an infant to parents who, in their professional opinion, lack the skills necessary to care for a special-needs infant, the primary concern at the time of discharge was the parents' ability to proficiently use the NG tube. The undisputed evidence shows that both Mother and Father attempted to demonstrate placement of the NG tube at the hospital, and nothing in the record suggests that their inability to demonstrate proficiency—as measured by three successful placements—was a "voluntary, deliberate, and conscious course of conduct."[5] *See In re M.L.L.*, 573 S.W.3d at 365.

Based on the record before us, we conclude that the evidence demonstrating that the parents failed to visit A.A. at the NICU with a frequency satisfactory to NICU staff and that the parents failed to demonstrate proficiency with A.A.'s NG tube before the scheduled date of her discharge is legally insufficient, standing alone, to support a finding by clear and convincing evidence that the parents engaged in an "voluntary, deliberate, and conscious course of conduct" that endangered A.A. *See In re C.L.J.*, 2014 Tex. App. LEXIS 3146, at *13-14. Moreover, even upon considering this evidence along with evidence concerning the parents' failure to attend all of A.A.'s medical appointments during the pendency of this case, we cannot conclude that the evidence is legally sufficient to support the trial court's finding regarding subsection (E). *See id.*

---

[5] We are not suggesting that a parent-child relationship cannot be terminated based on a parent's inability to care for his or her child, *see* Tex. Fam. Code § 161.003(a)(1) (providing for termination upon finding that parent has mental or emotional illness or mental deficiency that renders parent unable to provide for physical, emotional, and mental needs of child until child is eighteen), only that under the evidence presented in this case, the failure to demonstrate proficiency with the NG tube, although critical, by a certain deadline does not constitute endangering conduct under subsection (E).

(concluding that evidence was legally insufficient to support termination based on endangerment, even when it considered "the testimony about appellants' marihuana use during this case or the fact that department was involved with [appellant mother] with respect to her older children"). In other words, even viewing this evidence in the light most favorable to the finding, we cannot conclude that a reasonable factfinder could have formed a firm belief or conviction that the parents engaged in a course of conduct that endangered A.A.'s physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(E). Because this is the only evidence identified as endangering conduct as to Father, we reverse the trial court's endangerment finding as to Father.

As to Mother, however, the evidence presented at trial relevant to the issue of endangerment was not limited to her conduct during A.A.'s time in the NICU or to her failure to attend some of A.A.'s medical appointments during the pendency of this case. At trial, the Department also presented evidence showing that Mother had previous involvement with the Department as to an older son, J.A, who is unrelated to Father.[6] In January 2015, before she was dating Father, Mother was referred to the Department based on allegations that she had used drugs and that she had medically neglected J.A. After Mother obtained medical care for J.A. and submitted to a drug test, which was negative, the referral was ruled out.

In October 2015, the Department received a second referral for Mother as to J.A. After being arrested for theft arising from a car rental, Mother left J.A., who was then three years old, in the care of a non-relative friend. That friend later felt unable to meet J.A.'s needs and, consequently, contacted the Department. While Mother was incarcerated, the Department placed

---

[6] Mother also admitted at trial that she had another child, G.L., who at the time of trial was nineteen years old and lived in Colorado. Mother testified that she was G.L.'s caretaker until he was six years old, but it is unclear from the record who had legal custody of G.L. after that time, and there is no evidence of Department involvement as to G.L.

15

J.A. with foster parents and subsequently sought to terminate Mother's rights to J.A. Mother was released from incarceration in March 2016, and a jury trial to terminate her parental rights to J.A. was held in March 2017. At the conclusion of the trial, the jury denied the Department's request for termination. Mother was appointed J.A.'s possessory conservator, and J.A.'s foster parents were appointed his permanent managing conservators.

J.A.'s foster father and the Department caseworker that investigated the claims against Mother involving J.A. both testified at the trial to terminate Mother's and Father's rights to A.A. J.A.'s foster father testified that when J.A. initially began living with him and his wife, J.A. was physically and verbally aggressive and that he had made progress with these behavioral issues since being in their home. In addition, J.A. had to have "fairly major dental work" to address dental problems that arose before his removal but was now receiving regular care. According to J.A.'s foster father's testimony, Mother failed to attend approximately half of her scheduled visits with J.A. after she was released from prison but while the case involving J.A. was still pending. Since being appointed possessory conservator of J.A., Mother has been in contact with J.A., but she has not had in-person contact.

The Department caseworker testified that the Department's investigation of Mother's care of J.A. revealed that, due to neglect, J.A.'s teeth were severely decayed, and a majority of his baby teeth had to eventually be removed or "capped." She also testified that J.A.'s therapist had diagnosed him with PTSD and with reactive-attachment disorder and that this diagnosis indicated to her that J.A. "had no one to run to or to meet his needs." Finally, the caseworker testified that, during the pendency of the case involving J.A., Mother failed to participate in or complete services required by the Department, including failing to attend multiple random drug tests and missing numerous therapy appointments.

16

In addition, the trial court heard evidence that, in the Department's view, shows a pattern of drug use by Mother. First, the Department presented evidence, and Mother acknowledged in her testimony, that in 2008 she pleaded guilty to the offense of possession of a controlled substance. Also, according to a psychological evaluation performed on Mother in January 2017, Mother admitted to the psychologist that she had once used marijuana and cocaine "a long time ago." Finally, the trial court heard that while the Department's case involving J.A. was pending, Mother failed to submit to approximately five drug tests in 2016, despite the fact that the Department offered to transport Mother to those tests, and in May 2019, while this case involving A.A. was pending, Mother produced a positive result for methamphetamine using a hair-follicle test.

However, the trial court also heard that in June 2018, a month after testing positive for methamphetamine, Mother produced a clean hair-follicle test for methamphetamine and that a hair-follicle test can trace the use of substances as far back as 90 days. In addition, in a psychological evaluation conducted in August 2018, Mother reported to the psychologist that she had never used alcohol or illegal drugs, and at trial, Mother denied having ever taken any illegal drugs. Mother's therapist, a trauma and substance-abuse specialist who began treating Mother while this case was pending, testified at trial that Mother has made excellent progress in her therapy for PTSD, that she had not seen any evidence that Mother is using illegal drugs, and that she attributes Mother's positive drug test to her prescription for Afrin. Similarly, Father testified that he did not use drugs and that he had not seen any evidence of drug use by Mother. Finally, the trial court heard conflicting testimony about whether some of the medications that Mother takes to control her seizures could have produced a positive test for methamphetamine. Mother's primary care physician told the trial court that several of the medications that Mother

17

has been prescribed could have resulted in positive hair follicle test for methamphetamine, whereas a toxicologist employed by the lab that processed Mother's positive drug test explained that they would not have.

A parent's mistreatment of other children may be considered in deciding whether that parent engaged in a course of conduct that endangered the physical or emotional well-being of a child. *Cervantes-Peterson v. Texas Dep't of Fam. & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.). In addition, evidence of a parent's criminal history, convictions, and resulting imprisonment may establish an endangering course of conduct. *In re J.S.*, 584 S.W.3d 622, 635 (Tex. App.—Houston [1st Dist.] 2019, no pet.). Similarly, because it exposes the child to the possibility that the parent may be impaired or imprisoned, a parent's illegal drug use and drug-related criminal activity may support termination under subsection (E). *See A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied); *In re M.C.*, 482 S.W.3d 675, 685 (Tex. App.—Texarkana 2016, pet. denied). *But see In re L.C.L.*, 599 S.W.3d 79, 85 (Tex. App.—Houston [14th Dist.] 2020, pet. filed) (en banc) (explaining that "[s]omewhere along the way, [that court of appeals] conflated drug use with child endangerment such that mere drug use became conclusive evidence that a child was endangered").

Assuming that the trial court resolved disputed facts in favor of the finding of endangerment and that it disregarded all evidence that a reasonable factfinder could have disbelieved, we conclude that evidence shows that before A.A.'s birth in 2017, Mother neglected an older child; that she was convicted of criminal activity in 2008 and incarcerated for criminal activity in 2015; that Mother failed to appear for drug tests in 2016 because she was using drugs; and that, based on her most recent positive drug test, Mother has used illegal drugs as recently as

18

2019. Consequently, after viewing the evidence in the light in the most favorable to the trial court's finding and considering the undisputed evidence to the contrary to the finding under subsection (E), we conclude that a reasonable fact finder could have formed a firm belief or conviction that Mother engaged in a course of conduct that endangered A.A.'s physical and emotional well-being.

Upon considering the entire record, however, including the disputed evidence contrary to the finding that Mother engaged in conduct endangering to A.A.—including her primary care physician's testimony that Mother's positive test for methamphetamine in May 2019 was caused by her prescriptions, her negative drug test the following month, and the testimony of her therapist stating that Mother had made significant progress in her therapy and that she had not seen any signs of drug use by Mother—and weighing this evidence against all the evidence favoring the finding of endangerment—including evidence of criminal activity, the details of which are unknown, and neglect occurring several years before A.A.'s birth—we conclude that the evidence is factually insufficient to support the trial court's finding that Mother engaged in a course of conduct that, at the time of A.A.'s birth, was endangering to A.A. In other words, we conclude, in light of the entire of record, that the disputed evidence contrary to the finding is so significant that a reasonable factfinder could not have formed a firm belief or conviction that Mother engaged in conduct which endangered A.A.'s physical or emotional well-being. The evidence is factually insufficient to support the trial court's finding that termination of Mother's parental rights was warranted under subsection (E).

*Subsection O, Compliance with Family-Service Plans*

Next, we consider Mother's and Father's legal and factual-sufficiency challenges to the trial court's determination that termination of their parental rights was warranted under subsection (O). To terminate parental rights under subsection (O), the Department must show by clear and convincing evidence that (1) the child was removed under Chapter 262 of the Texas Family Code for abuse or neglect, (2) the child has been in the conservatorship of the Department for at least nine months, and (3) the parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain return of the child." *See* Tex. Fam. Code § 161.001(b)(1)(O).

In their briefs, Mother and Father do not dispute that A.A. was in the conservatorship of the Department for at least nine months or that their family-service plan constitutes "a court order that specifically established the actions necessary for [A.A.'s return]." Instead, Mother and Father contend that the evidence is legally and factually insufficient to support findings that they failed to comply with their family-service plans and that A.A. was removed for "under Chapter 262 for abuse or neglect."

Whether a child was removed for "abuse or neglect" depends on the surrounding facts and circumstances and is generally determined on a case-by-case basis. *In re S.M.R.*, 434 S.W.3d 576, 583 (Tex. 2014); *D.F. v. Texas Dep't of Fam. & Protective Servs.,* 393 S.W.3d 821, 830 (Tex. App.—El Paso 2012, no pet.). The phrase "abuse or neglect" is not defined in Chapter 262, and the chapter does not indicate any special or technical meaning for the phrase. *In re S.M.R.*, 434 S.W.3d at 582-83. The Texas Supreme Court has recognized, however, that the phrase "abuse or neglect" is not limited to allegations of actual abuse or neglect inflicted on a child but, instead, necessarily includes the risk or threats posed by the environment in which the

child is placed. *See In re E.C.R.*, 402 S.W.3d 239, 246 (Tex. 2013). "Thus, we are to consider 'neglect' as used in [subsection (O)] in a broad sense, which may encompass the risk of future neglect, and ask whether a person of reasonable prudence could have found that [the child] faced an immediate danger to [her] health or safety." *In re C.L.J.*, 2014 Tex. App. LEXIS 3146, at *16 (citing *In re E.C.R.*, 402 S.W.3d at 248).

At trial, the Department presented little evidence concerning its initial decision to remove A.A. In fact, no Department investigator or caseworker assigned to A.A.'s case testified at trial. However, the clerk's record reveals that in support of its petition for emergency removal, the Department submitted the affidavit of Kelly Johnson, a Department caseworker supervisor. In her affidavit, Johnson summarized a discussion she had with social worker Bishop and the NICU staff's concerns that "the parents of [A.A.] had not followed through with engaging with medical staff to learn how to care for their baby," who "was born premature and requires feeding through a specialized tube."[7] Based on the factual allegations presented in Johnson's affidavit, along with the trial court's finding in its removal order that A.A. was in "immediate danger," the Department argues that the record is sufficient to establish that A.A.

---

[7] According to the affidavit, Bishop told Johnson that (1) Mother had self-reported that she suffered from a traumatic brain injury and seizures, along with PTSD, "which may impact her ability to care for A.A."; (2) "the parents have not engaged with [A.A.'s] care and have not demonstrated the ability to feed [A.A.] or provide for her needs"; (3) in January 2018, the parents visited A.A. thirteen times, and there were five days with no contact; (4) in February 2018, the parents did not visit A.A., but called nine times to check on her; (5) Mother reported on February 22, 2018, that father had the flu and was told by hospital staff that they could not return to the NICU until March 1; (6) hospital staff informed the parents that they need to "have an increased presence at hospital to learn how to care for A.A."; (7) the parents visited A.A. nine times between March 5 and March 29, 2018, and (8) the parents did not present for an overnight visit until the week of March 29, 2018, "but this was not enough time for the parents to demonstrate the ability to care for A.A. continuously or consistently."

was removed for risk of neglect.[8] That is, the Department suggests that the trial court could have reasonably concluded from the circumstances as presented in the removal affidavit, including A.A.'s specialized medical needs and Mother's seizure history, that A.A.'s release from the NICU to her parents' custody posed an immediate danger to her health or safety. Based on the record before us, we agree with the Department's contention. *See In re E.C.R.*, 402 S.W.3d at 248-49 (relying on caseworker's affidavit submitted in support of removal and findings in removal order to support finding that child was removed for abuse or neglect). Applying the applicable standards for legal and factual sufficiency, we conclude that the trial court could have reasonably formed a firm belief or conviction that A.A. was removed due to a risk of neglect.

Next, we consider whether the evidence is sufficient to show that Mother and Father failed to comply with their family-service plans. Partial or substantial compliance with a court-ordered family-service plan is not enough to avoid a termination finding under subsection (O). *W.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00713-CV, 2020 Tex. App. LEXIS 2226, at *10 (Tex. App.—Austin Mar. 18, 2020, pet. denied) (mem. op.). On the other hand, partial or substantial compliance with a court-ordered family-service plan does not establish non-compliance as a matter of law. *See In re S.M.R.*, 434 S.W.3d at 584 ("But when questions of compliance and degree [under subsection O] are raised, and the trial court declines to terminate on this ground, the evidence is not conclusive; it is disputed."). Instead, whether a parent has done enough under the family-service plan to avoid termination under subsection (O) is ordinarily a fact question and decided on a case-by-case basis. *Id.*; *In re J.S.*, 291 S.W.3d 60, 67 (Tex. App.—Eastland 2009, no pet.) (analyzing substantial-compliance argument as factual-

---

[8] In its emergency order for protection, the trial court stated that it considered the evidence, including Johnson's sworn affidavit, and found that A.A.'s removal was justified because "there is an immediate danger to the physical health or safety of [A.A.]."

22

sufficiency challenge)). In addition, the service plan must be specific enough to allow for the parent's compliance to be objectively measured. *In re C.A.W.*, No. 01-16-00719-CV, 2017 Tex. App. LEXIS 6767, at *12 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). (mem. op.). Finally, a court may not order termination under subsection (O) if the parent proves by a preponderance of the evidence that the parent was unable to comply with a specific provision and the parent made a good-faith effort to comply and failure to do so was not the parent's fault. *See* Tex. Fam. Code § 161.001(d).

As previously discussed, no one from the Department testified at trial as to what Mother's and Father's family-service plans required and whether Mother and Father complied with these requirements. Nevertheless, Mother's and Father's service plans were admitted into evidence and establish that the parents were both required, in part, to "attend medical appointments for [A.A.] or make sure that one person from [the] family that will be a primary caretaker attend the appointment." On appeal, the Department asserts that the undisputed testimony of A.A.'s foster mother establishes that both Mother and Father failed to comply with this requirement.

At trial, A.A.'s foster mother explained that while this case was pending, A.A. had a total of fifty-two medical appointments; that Mother and Father were notified of thirty-nine of the appointments; and that Mother attended fifteen and Father attended ten of A.A.'s medical appointments. When asked about whether other family members attended A.A.'s medical appointments, A.A.'s foster mother stated, "So, for a while when [Mother] was having a high-risk pregnancy in and out of the hospital, [Father's] parents were coming to some appointments. I can't tell you how many, but I think it was like four or five maybe. Then they had one family friend, Walter, I believe came to one. I know [Father's sister] came to one eye appointment. So,

23

there's been several people that have come, but it's not been, like, consistent people coming, if that makes any sense." The foster mother also testified that A.A. had been hospitalized four times during the pendency of the case, and that the parents had visited A.A. in the hospital when given the opportunity.

In his testimony, Father acknowledged that he likely missed about half of A.A.'s medical appointments but explained that either Mother or another family member that would be a primary caretaker for A.A. attended any medical appointments that he missed. Similarly, Mother testified that she believed that she had attended most of A.A.'s medical appointments and that she only failed to attend when she was sick or in the hospital. Finally, A.A.'s pediatrician testified that, at the time of trial, he had seen A.A. approximately eight times and that each of those appointments was attended by one or both of the foster parents, one or both of the parents, and a caseworker from the Department.

Contrary to the Department's suggestion, we do not read the parents' family-service plans as specifically requiring *both* parents to attend *all* of A.A.'s medical appointments. In fact, nothing in the language of the service plans requires *either* parent to attend to A.A.'s medical appointments, so long as the appointment is attended by a "person from [the] family that will be a primary caretaker." Nevertheless, viewing the evidence as to A.A.'s medical appointments in the light most favorable to the trial court's finding under subsection 161.001(b)(1)(O), we conclude that the trial court could have reasonably formed a firm belief or conviction that neither Mother, nor Father, nor any other "person from [the] family that will be a primary caretaker," such as Father's parents, attended A.A.'s medical appointments, as required by the parents' service plans.

24

Upon considering the entire record, however, and weighing the disputed evidence contrary to the trial court's finding—including evidence on the issue of whether other family members attended A.A.'s medical appointments, we conclude that the contrary evidence is so significant that the trial court could not have reasonably formed a firm belief or conviction that Mother and Father failed to comply with their obligations under their service plans to attend A.A.'s medical appointments. This is the only basis for non-compliance with the family-service plan that has been asserted by the Department, and the record does not affirmatively reveal any other basis. Consequently, we conclude that, although the evidence is legally sufficient, it is not factually sufficient to support findings that Mother and Father failed to comply with "a court order that specifically established the actions necessary for [A.A.'s return]" and, consequently, that termination of their parental rights was warranted under subsection (O).

### Subsection (N), Constructive Abandonment

Finally, we consider Mother's and Father's challenges to the trial court's finding under subsection (N) of Section 161.001(b)(1). Subsection (N) provides that the trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has constructively abandoned a child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months, and (i) the Department has made reasonable efforts to return the child to the parent; (ii) the parent has not regularly visited or maintained contact with the child; and (iii) the parent has demonstrated an inability to provide the child with a safe environment. *See* Tex. Fam. Code § 161.001(b)(1)(N). On appeal, Mother and Father assert that the Department failed to meet its burden to establish that (1) they have not regularly visited or maintained contact with

A.A. and (2) they have demonstrated an inability to provide a safe environment for A.A. The Department has not responded to the parents' arguments regarding subsection (N).

The undisputed evidence shows that, following A.A.'s removal, Mother and Father attended supervised visits with A.A., as required by their family-service plans. Although Father conceded that he missed four visits and Mother acknowledged missing at least some visits due to illness or hospitalization, the Department did not present any evidence as to what percentage of all visits Mother and Father actually missed. In addition, the trial court heard that at least on one occasion, the parents met with A.A.'s speech pathologist during a supervised visit with A.A. to learn about A.A.'s feeding challenges and that, as previously discussed, the parents attended at least some of A.A.'s medical appointments and visited A.A. when she was hospitalized during the pendency of this suit. Viewing the evidence in the light most favorable to the finding of constructive abandonment under subsection (N), we conclude that a reasonable factfinder could not have formed a firm belief or conviction that Mother and Father have "not regularly visited or maintained significant contact" with A.A. during the pendency of this suit. Consequently, the evidence is legally insufficient to support the trial court's finding under subsection (N).

In summary, based on the unique facts presented by the record in this case, we have concluded that the evidence is legally insufficient to support termination of Father's parental rights under subsection (E) and subsection (N) and that the evidence is factually insufficient to support termination of Father's parental rights under subsection (O). As to Mother, we have determined that the evidence is legally insufficient to support termination under subsection (N) and that the evidence is factually insufficient to support termination under subsection (E) and subsection (O). Because the evidence is insufficient to support all of the

26

statutory predicate findings on which the trial court relied, we will reverse that portion of the trial court's termination order terminating Mother's and Father's parental rights and remand for a new trial. We need not decide Father's and Mother's remaining challenges to the trial court's best-interest finding. *See* Tex. R. App. P. 47.1.

**Conservatorship Finding**

In a separate issue, Mother and Father challenge the trial court's decision to appoint the Department as A.A.'s managing conservator.[9] Specifically, Mother and Father challenge the trial court's finding that appointment of Mother and Father as managing conservators or as joint managing conservators "would not be in the best interest of the child because the appointment would significantly impair the child's physical or emotional development."

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship[.]" Tex. Fam. Code § 153.002. When a trial court terminates both parents' rights to their child, the court must appoint "a suitable, competent adult, the Department, or a licensed child-placing agency, as the child's managing conservator. *See id.* § 161.207. In addition, independent of a trial court's decision on a request for termination, the Texas Family Code creates a rebuttable presumption that it is in a child's best interest for his parents to be named as joint managing conservators. *See id.* § 153.131(b); *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). To rebut this presumption, the court must find, as

---

[9] The Texas Supreme Court has recognized that the termination of parental rights and the appointment of the Department as managing conservator are two distinct issues, each of which must be individually challenged on appeal. *In re J.A.J.*, 243 S.W.3d 611, 615-17 (Tex. 2007).

27

it did here, that appointment of a parent or parents "would significantly impair the child's physical or emotional development." Tex. Fam. Code § 153.131(a).

Conservatorship decisions are governed by a preponderance-of-the-evidence standard, which is less stringent than the clear-and-convincing-evidence standard for decisions on termination of parental rights. *In re J.A.J.*, 243 S.W.3d at 616. Likewise, the standard of review for the appointment of non-parent sole managing conservator is less stringent than the standard of review for termination of parent rights. *Id.* We review a trial court's decision regarding conservatorship for an abuse of discretion. *Id.* A trial court abuses its discretion if its decision is arbitrary and unreasonable. *Id.*

At trial, the court heard evidence concerning Mother's physical and emotional health and A.A.'s specialized medical needs and could have reasonably inferred from this evidence that, in the absence of another properly trained family member being present at all times, it would be unsafe for Mother to care for A.A. In addition, the factfinder heard evidence that Father, who works at least twelve hours a day, would be unavailable most of the time to assist Mother and that, although his parents live nearby and have offered to help with A.A., at the time of trial they were also caring full time for N.A. Finally, although we have concluded that the evidence regarding Mother's positive drug test and prior mistreatment of J.A. does not constitute clear and convincing evidence of endangerment, we recognize that this evidence is also relevant to the issue of conservatorship. *In re R.W.*, No. 01-11-00023-CV, 2011 Tex. App. LEXIS 4556, at *12-14 (Tex. App.—Houston [1st Dist.] June 16, 2011, no pet.) (mem. op.) (holding that evidence was factually insufficient to support finding that termination was in children's best interest but that trial court did not abuse its discretion in appointing Department as sole managing conservator).

28

Under the abuse-of-discretion standard and the less stringent evidentiary standard applicable to conservatorship, the trial court could have reasonably concluded that appointment of Mother and Father as A.A.'s managing conservators "would significantly impair the child's physical or emotional development." *See* Tex. Fam. Code § 153.131(a). Consequently, the trial court did not abuse its discretion in appointing the Department, and not the parents, as A.A.'s sole managing conservator.[10] *See In re J.A.J.*, 243 S.W.3d at 616 (explaining that "[b]ecause different standards apply, evidentiary review that results in a reversal of a termination order may not yield the same result for a conservatorship appointment"). We overrule issue five.

**CONCLUSION**

We affirm that portion of the trial court's order appointing the Department as permanent managing conservator of A.A. We reverse that portion of the trial court's order terminating the parental rights of Father to A.A., render judgment deleting those portions of the judgment regarding subsections (E) and (N) as to Father, and remand for a new trial as to whether termination of Father's parental rights is warranted under subsection (O). *See In re J.O.A.*, 418 S.W.3d 625, 626 (Tex. App.—Amarillo 2009, no pet.) (noting that remand for new trial is appropriate when appellate court determines that evidence is factually insufficient to support termination); *see also* Tex. R. App. P. 47.1, 47.4. We also reverse that portion of the trial court's order terminating the parental rights of Mother, render judgment deleting the portion of the judgment regarding subsection (N) as to Mother, and remand the case to the trial court for a new trial as to whether termination of Mother's parental rights is warranted under

---

[10] The trial court retains jurisdiction to modify a conservatorship order if it is in the child's best interest, and the parent's or child's circumstances have materially and substantially changed since the order was rendered. *Id.* at 617 (citing Tex. Fam. Code §§ 156.001, .101).

subsection (E) and subsection (O). *See In re J.O.A.*, 418 S.W.3d at 626. We instruct the trial court to commence the trial no later than 180 days after the mandate is issued by this Court. *See* Tex. R. App. P. 28.4(c).

_____

Chari L. Kelly, Justice

Before Justices Goodwin, Triana, and Kelly

Affirmed in Part; Reversed and Rendered in Part; Reversed and Remanded in Part

Filed: April 30, 2021